IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
GREENWOOD DIVISION

| | | |
|---|---|---|
| Jane Doe, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CIVIL ACTION NO. 8:04-23001-RBH |
| v. | ) | |
| | ) | |
| Erskine College, Dr. John Carson, | ) | |
| both individually and as President | ) | **O R D E R** |
| of Erskine College, Robyn Agnew, | ) | |
| both individually and as agent and/or | ) | |
| employee of Erskine College, and Monty | ) | |
| Wooley, both individually and as | ) | |
| agent and/or employee of Erskine College, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

On February 3, 2006, this matter came before me for hearing of the motion for summary

judgment filed on December 19, 2005 by defendants, Erskine College, John Carson, Robyn Agnew

and Monty Wooley. This is an action by plaintiff, Jane Doe, against the above defendants, alleging a

federal claim under Title IX, 20 U.S.C. §1681(a) and state law claims for defamation and intentional

infliction of emotional distress.  (The remaining causes of action were dismissed by Order of this

Court filed on June 22, 2005 or by consent of the plaintiff at the February 2006 hearing.)

### Summary Judgment Standard

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to

interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine

issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

Fed. R. Civ. P. 56(c).  Once the moving party makes the showing, however, the opposing party must

respond to the motion with "specific facts showing there is a genuine issue for trial." Fed. R. Civ. P.56(e).

When no genuine issue of any material fact exists, summary judgment is appropriate. Shealy v. Winston, 929 F.2d 1009, 1011 (4th Cir. 1991). The facts and inferences to be drawn from the evidence must be viewed in the light most favorable to the non-moving party. Id. However, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Id., quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).

## ALLEGED FACTS[1]

The following alleged facts are taken in the light most favorable to the plaintiff: On November 14, 2002 the plaintiff was sexually assaulted by a male student in his dorm room at Kennedy Dorm.[2]

---

[1] This case is very fact-intensive. A brief timeline of some important events follows: In November of 2002, the alleged assault occurred; the plaintiff reported it to her resident hall director and met with Ms. Agnew, as Dean of Women, and Lt. Stahl of the Erskine Public Safety Office; Dean Wooley met with the male student, with Plaintiff's parents at their request, and had discussions with President Carson and Chief Estep of Erskine's Department of Public Safety; and the plaintiff took a medical withdrawal from Erskine. In January of 2003, the plaintiff and her mother met with Wooley and Agnew; Chief Estep questioned the male student. A dining hall schedule was established for the spring 2003 term. In April of 2003, the alleged assailant was arrested and bail was set with the condition that the accused stay away from the victim, with no contact. In July of 2003, the plaintiff requested a hearing before the College Discipline and Appeals Committee (CDA); the hearing was held in August of 2003. The plaintiff appealed to the Presidential Appeals Committee (PAC), and a hearing was held in October of 2003. In November of 2003, the plaintiff's mother complained again of contact by the male student with her daughter. In February 2004, the male student was required to move to another dormitory. In January 2005, the South Carolina Attorney General's Office notified Erskine it would not proceed with the criminal charges.

[2] Defendants assert that the plaintiff visited the male student, whom she had been seeing for several weeks, at his dorm room. The defendants argue, based on the plaintiff's deposition testimony, that the plaintiff and the alleged assailant voluntarily became unclothed and that the plaintiff consented to him performing oral sex on her. Plaintiff does not appear to dispute these allegations. However, the plaintiff does assert that the sexual intercourse with the male student was not consensual.

2

She initially reported the rape to Ruth Burton, the residence director of her dorm, Bonner Dorm[3], on the Sunday immediately following the incident. Doe Dep., 146-147. Burton directed Plaintiff to report the rape to Robyn Agnew (hereinafter "Agnew"), Dean of Women. Id., 150. On either the next Monday or Tuesday, Plaintiff visited Agnew to report the rape. Doe Dep., 151. Plaintiff recalls Agnew telling her that she could press charges criminally or that she could pursue the matter through the school. However, Agnew indicated to the plaintiff several times that the school was not the right venue because of the severity of her case and the fact that Erskine is not equipped to deal with it. Id., 153 and 185. During the plaintiff's first couple of meetings with Agnew, Agnew was very compassionate toward the plaintiff. However, after learning the identity of the rapist, Agnew started acting rudely to the plaintiff. Id., 155.

Plaintiff understood Agnew to be the person to help her understand what could be done within the school framework. Id., 179-180. Agnew testified that she explained to Plaintiff how the College Discipline and Appeals Committee (hereinafter "CDA") process is run. Agnew instructed the plaintiff to go to the Erskine Department of Public Safety to give a statement because the male student knew that she had reported the rape. Id., 163. Agnew told the plaintiff that the Department of Public Safety already knew about the rape allegations and that they knew she would be coming there to give a statement. Id.. Plaintiff visited the Department of Public Safety on the Thursday after the incident, November 21, 2002. Id.. When the plaintiff visited the Erskine Dept. of Public Safety and met with Lt. Stahl, the investigating officer, she could not stop shaking or crying. Id., 164. Lt. Stahl did not know about the incident until the day the plaintiff gave her statement. He expressed frustration with Wooley and Agnew for not telling him sooner. Id., 211.

---

[3] The record reflects that Kennedy Dorm and Bonner Dorm are located next door to each other.

3

On Friday, November 21, 2002, Plaintiff took medical withdrawal from school. Doe Dep.,165. Dean Monty Wooley, Vice President of Student Services ("Wooley") met with the plaintiff's parents that day and pledged that the school wanted to do whatever they could to help. Wooley Dep.,12. However, the plaintiff's parents became upset with Dean Wooley when he claimed to have conducted his own investigation and that the male student was very bright, very intelligent, and "going places." Plaintiff's mother's Dep.,138.

Plaintiff spent the rest of November at home in bed. Doe Dep.,165-66. Plaintiff finally went to counseling because her mother insisted that she do so. Id, 221. At first, the plaintiff did not wish to return to Erskine because she felt Erskine wanted her to leave the school. Id., 350. However, after engaging in counseling and speaking with other victims of sexual assault, she decided she wanted to return. Id. at 234. In addition, she had registered for an interim trip to Australia with 10 other students and faculty for sixteen (16) days. Id., 236.

Prior to the Australia trip, on January 7, 2003, Plaintiff and her mother met with Dean Wooley and Agnew regarding her fears about being on campus and running into her assailant. Id., 251. Dean Wooley told her that she could do something through the school but that if she was not able prove sexual assault at the hearing, she would be charged with having had sex on campus, which would be viewed as conduct unbecoming of an Erskine student. Id., 252. Dean Wooley said that a restraining order would not be necessary because he would have a good "heart-to-heart talk" with the boy. Id., 253. Plaintiff and her mother expressed to Dean Wooley and Agnew during the meeting that they did not understand why the school had not yet requested a statement from the male student. Id., 255. Dean Wooley and Agnew offered no further instruction or guidance to the plaintiff. Id., 252-253.

4

During the spring semester, the plaintiff was still not improving. She dropped her biology class because it was held in the Science Center, and every time she went to class she ran into the male student. Id., 269. Plaintiff started taking antidepressants. Id., 269. She was not able to sleep, so her doctor prescribed Valium. Id. at 269. Plaintiff decided to press charges shortly after she began cutting herself. Id., 352. She had discussed with her counselors the fact that pretending the rape did not happen was not working. Id., 352.

Plaintiff made the decision to seek criminal action against the male student in April 2003 and visited Chief Smith of the Due West Police Department to press charges. Chief Smith told the plaintiff that he did not have jurisdiction and that she would have to go back to Erskine. Id., 270. Chief Smith told the plaintiff that the male student had already told him, "I need to talk with someone because I just raped someone," Id., 304, but that he then changed his statement to "I've been charged" with rape, Id., 305.

Plaintiff visited Chief Estep of the Erskine Department of Public Safety and he accompanied her to the Magistrate's Office to file charges. An arrest warrant was issued on April 14, 2003. Id., 270. The judge included a condition on the male student's bond that stated, "stay away from victim; have no contact whatsoever." Erskine was made aware of the no-contact order when the plaintiff's mother faxed a copy of the order to Estep. Estep Dep.,31. Estep presented the no-contact order to his supervisor, Dean Wooley. Id., 32.

Based upon the no-contact order, Estep, who was also resident director of a dorm on campus, recommended to Wooley that they comply with the order by having the male student commute from off-campus housing. Id., 33. Wooley responded by saying that they are both students with a right to an education and that the male student had not been found guilty of any crime so he could not do that.

5

Id., 33. Estep then recommended that the male student be removed from Kennedy Dorm and relocated across campus because Kennedy Dorm was right next to the plaintiff's dorm, Bonner Dorm. Id. The male student eventually was moved across campus, but not until the spring of 2004. Id., 34 and 70.

When asked if there was any particular incident that inspired the plaintiff to pursue a subsequent rule to show cause hearing, she responded, "Every day. Every day. He just wouldn't walk away or leave me alone." Doe Dep., 276. Plaintiff described a day when she shouted at the male student because his friends were pointing and laughing at her and she cried. Id., 303. During one of Plaintiff's softball games, the male student came out on the field and made a point of throwing softballs right beside her. Id., 378. In another incident, Plaintiff was approached by one of the male student's friends, who confronted Plaintiff on her decision to press charges. She thought it inappropriate for Plaintiff to press charges and wanted to know if Plaintiff really needed to ruin the male student's life in order to get better. Id., 329. When asked if she felt as though her contacts with the male student limited her ability to participate in or benefit from an educational program or activity at Erskine, Plaintiff replied, "I feel so, yes." Id., 378. Plaintiff suffered anxiety attacks when she was forced to have contact with the male student. Plaintiff described the attacks she suffered from her forced contacts with the male student. "Like you black out, you tense up like your body temperature goes up and down from hot to cold. You feel like you can't breathe, pain throughout your body. You have to just leave….. I mean I always break out in these weird rashes and feel like the world is caving in on you." Id., 275. Plaintiff's counselor, Dr. Joanne Armstrong, told Plaintiff that these were symptoms of panic attacks. Id., 275-276.

Plaintiff eventually obtained cooperation from Erskine in setting a dining schedule for her and the male student so that she could avoid contact at meal times. Id., 368. However, Erskine scheduled her in a biology class where the male student was the lab assistant to the professor. It was not until the

plaintiff's attorney contacted the school that Erskine removed Plaintiff from the male student's lab. Id., 369. Plaintiff understood that Dr. Don Weatherman[4] (hereinafter "Weatherman") was supposed to be checking the class schedules to make sure that the two were not placed in the same class. Id., 368.

On July 2, 2003, the plaintiff notified Erskine that she had decided to pursue charges before the CDA. A hearing was held on August 12, 2003, allegedly after being postponed several times. The plaintiff's physician and some other witnesses were not able to attend due to the fact the hearing was re-scheduled.

The normal procedure for the CDA is to receive documentation from the Office of Student Services about the context of the case. Christie[5] Depo., 15. Then, they hear statements from the parties involved and any witnesses. The CDA then goes into executive session and reviews the documentation, discusses the case and makes a decision. Id. Dr. Brad Christie (hereinafter "Christie") defined the role of Chair of the CDA as receiving materials about the case and presiding over the hearing. Id., 10.

The CDA was provided with a packet of information put together by Wooley and Agnew. Agnew Dep., 32. Plaintiff was provided with a copy of the CDA packet by Chief Estep the night before the hearing. Pl.'s Dep. at 291; see also Estep Dep., 63. She did not know that the packet existed prior to that evening and it contained a lot of information that she had never seen before. Doe Dep., 291. The male student was allegedly provided with a copy of the packet one week prior to the hearing, so

---

[4] Dr. Don Weatherman is Erskine's Executive Vice President of Academics and a dean of the College. He has been employed with Erskine since July 1999, and supervises much of the faculty. Weatherman Dep., 5.

[5] Dr. Brad Christie is an English professor at Erskine for the last 15 years and also was appointed to the CDA that heard the plaintiff's case. Christie Dep., 6-7.

7

he was better able to prepare. Id. The CDA hearing would normally be chaired by Dr. John Wingard[6] (hereinafter "Wingard"). However, in Plaintiff's case, Wingard recused himself because of conversations with Plaintiff concerning the alleged sexual assault. Wingard Dep., 9. The Vice Chair of the CDA, Dr. Brad Christie was to take over as Chair. Christie Dep. at 8. Christie testified that the plaintiff's case was the first case heard by Erskine's CDA, in which he participated, that involved allegations of rape. Id., 36.

Even though Christie was acting as the effective Chair of CDA for Plaintiff's case, the procedure was changed. Bowe Dep. at 10. Professor Bowe testified that, "the normal procedure is that the chair runs the meeting. In this case, Mr. Bill Patrick[7] acted as a hearing officer." Id., 10-13. According to Gid Alston[8] (hereinafter "Alston"), another change in the normal procedure for CDA hearings was that Plaintiff and the male student were made to appear before the CDA in the same room at the same time. Alston Dep., 11. Alston explained that the reasoning behind not putting both the accuser and the accused in the same room during testimony at the hearing involved a concern that the accuser might not open up if the accused was there and that this arrangement always worked pretty well in his years of his experience on CDA. Id., 44. Plaintiff was told that she could not have her lawyer, her psychologist, her mother or her father present with her during the hearing. Doe Dep. at p. 292 and 298. After the plaintiff requested a victim's advocate, Estep appointed Fitzgerald to serve in that capacity. Id., 292; and

---

[6] Dr. John Wingard has served Erskine as a professor of Philosophy for the last 6 years. Wingard Dep., 5.

[7] Bill Patrick served as the attorney for Erskine College in the handling of the plaintiff's case at the time of the CDA hearing. Patrick Dep., 6.

[8] Gid Alston has served Erskine for 18 years as a professor and chair of the Dept. of Health, Physical Education, Sports Management and Athletic Training. Alston Dep., 15-19. He also served on the CDA for the plaintiff's case. Alston Dep., 8-9.

8

Fitzgerald Dep., 13.  Fitzgerald had never served as a victim's advocate. Id., 13-14.  Plaintiff attempted to talk to Fitzgerald in her capacity as the victim's advocate, but she was turned away by Fitzgerald's supervisor.  Doe Dep., 293.  When Plaintiff was first introduced to Fitzgerald, she felt as though Fitzgerald did not understand her role with respect to Plaintiff's case.  Id., 295.  Plaintiff indicated her frustration over the fact that Fitzgerald was not always able to answer her questions. Id., 296.  However, Fitzgerald did apologize for not always knowing how to respond to her questions.  Id., 297.  Fitzgerald appeared at the CDA hearing to provide support for both the plaintiff and the male student.  Dean Wooley and Estep told her that Fitzgerald was the victim's advocate for both of them.  Id., 299.

Plaintiff was upset with the way the CDA hearing was conducted.  Id., 301.  Estep was willing to testify at the hearing.  However, Estep was not allowed to testify since the male student was promised by Dean Wooley that Estep would not testify.  Id., 301.  However, Plaintiff was told he could not testify because he was called out of order.  Estep Dep., 49.  Christie stated that based upon his experience of service on the CDA, the public safety officer would normally be heard by the CDA.  Id., 35.

Plaintiff felt that Estep understood the case better than she did and that he "could explain the criminal stuff better than I could've."  Doe Dep., 302.  Additionally, Estep's investigation allegedly contained information that had not yet been shared with Erskine.

In the fall of 2003, the plaintiff was approached by her Calculus professor, Ann Bowe, (a CDA panel member) out of concern that the plaintiff did not appear to be getting any better. Doe Dep., 323. Despite her participation in the CDA's deliberations, Bowe did not know that the CDA found the plaintiff herself guilty of sexual misconduct until the plaintiff read her the letter she had received about the CDA's decision.  Bowe Dep., 24.  Christie verified that the only decision to be made by the CDA that day was whether or not the male student committed sexual assault.  Christie Dep., 17.  Christie

confirmed that the CDA engaged in discussions that both parties conducted themselves in a way that was inappropriate. Id.,17. Bowe testified that Erskine never provided her with any kind of definition of sexual misconduct. Bowe Dep., 23. Furthermore, Erskine never provided Vice Chair Christie with a definition of conduct unbecoming of an Erskine student. Christie Dep., 19.

Plaintiff told Bowe that she wanted an explanation of why the CDA found her guilty of engaging in sexual misconduct. Doe Dep., 323. Bowe said the CDA's final decision was that the male student was not guilty of sexual assault, but only recalls a discussion about whether or not the two students engaged in sexual misconduct. Bowe Dep., 22. Thus, Bowe recommended that the plaintiff visit Christie. Plaintiff stated that Christie responded to her inquiry by saying that the committee did not know what they were doing and that they had tried their best. Doe Dep., 324. Christie then told the plaintiff to put herself in the male student's shoes. Id. ,324. He further stated that without physical evidence it was impossible to find the male student guilty of sexual assault. Id., 324.

Rich Schelp[9] also served on Erskine's CDA committee for the plaintiff's case and was assigned to take minutes of the hearing. Schelp had served on at least two CDA hearing panels prior to Plaintiff's hearing, but neither of the hearings involved issues of sexual assault. Schelp Dep.,17. Schelp testified that other than discussions about the pending litigation at the CDA's meeting of August 1, 2004, he did not receive training on how to proceed with his role as a CDA member. Id., 22. In fact, Schelp did not receive training from Erskine on how to handle a sexual assault case. Id., 12. Schelp does not recall Erskine ever providing him with a definition of sexual assault. Id., 24. When asked how Schelp would respond to a student approaching him with a report of rape, Schelp ultimately stated that

---

[9] Rich Schelp has served Erskine as an associate professor of physics for the last six years. Schelp Dep., 5.

he "didn't know because it's so hard for me to imagine exactly how this would all go. It's very far from my experience." Id., 13-14.

In regard to the CDA process, Schelp wrote an e-mail to Wingard stating that, "writing the minutes made me concerned about the way the meeting was conducted." See Ex. 37. When asked in his deposition what he meant by this statement, he testified that he was concerned that where the Roberts Rules of Order type structure were not followed, it is difficult to know what the committee really decided. Schelp Dep., 35. Despite Schelp's concerns, nothing was done to change the CDA hearing result. Id., 33.

The only exhibits provided at the hearing were reports from the plaintiff's doctors and statements collected by Chief Estep. Agnew appeared before the CDA and recounted her conversations with the plaintiff concerning her belief that the indication in the plaintiff's medical records that she had a pelvic inflammatory disease (PID) meant that she had a sexually transmitted disease (STD). Agnew affidavit; Doe Dep., 325. Plaintiff wanted her doctors to appear at the CDA to explain the records, but rescheduling of the CDA hearing prevented her from doing so. Christie testified that the inference that Plaintiff had an STD contributed to the decision found by the CDA that the plaintiff voluntarily had intercourse with the male student. Christie Dep., 18-22.

The CDA found that the male student did not commit a sexual assault on the plaintiff. It further found that both students had engaged in sexual misconduct. Plaintiff filed for an appeal of the CDA's decision by filing an application with the Presidential Appeals Committee (hereinafter "PAC") on August 14, 2003.

11

According to Tracey Spires,[10] the PAC convened to answer two issues on appeal. The first issue was Plaintiff's desire to have the determination as to her by the CDA of conduct unbecoming an Erskine student reversed. The other was the plaintiff's appeal of the CDA's decision that the male student was not guilty of sexual assault. Spires Dep., 12. Spires never received any training from Erskine College on how to handle a sexual assault case, Id.,16, nor did he receive any training on how to carry out his role on the PAC, Id., 16-17. Cory Young[11] was asked to serve on the PAC for Plaintiff's case. He testified that he received no training for how to proceed as a PAC member either generally or specifically for Plaintiff's case. Young Dep., 9-10. Steve Sniteman[12] also served on the PAC in the plaintiff's case. When asked if Erskine College offered any sort of course or training to its faculty members with regard to handling sexual assault cases, Weatherman said, "I do not know." Weatherman Dep., 18.

When asked what direction he received from Erskine on how to proceed with his role on the committee, he responded, "We did not really receive any instruction per se about conduct." Sniteman Dep., 9. He went on to say, "Since we do not have many of those – I mean, we just don't have that many problems at Erskine, we're blessed with that." Id.

The PAC discussed that if the PAC upheld the CDA's decision that the male student and the plaintiff were guilty of sexual misconduct, the overall consequence would be that a woman would not

---

[10] Tracey Spires is employed at Erskine as Director of Institutional Research. Spires Dep., 5. He has also served on the PAC.

[11] Cory Young served Erskine as an Admissions counselor for 4-5 years at Erskine. Young Dep., 6.

[12] Steve Sniteman has been employed with Erskine for twelve years and currently serves as a professor of Family Studies and also performs marketing and graphic design functions for Erskine.

report rape if she was found to have done something wrong.  Id., 18-19.  The PAC agreed that Plaintiff and the male student were guilty of sexual misconduct, but for the "greater good," they agreed to drop that part of the CDA's decision.  Id., 19.  President John Carson[13] (hereinafter "Carson") concurred with the decision of the PAC in the plaintiff's case.  Carson Dep. at 21.  However, when writing to the parties regarding the PAC's decision on October 14, 2003, he expressed his disapproval of the parties' conduct.  See Ex. 15, E-1212.

Plaintiff alleges that her grades suffered and that she thus became ineligible for several scholarships.  Plaintiff entered Erskine after having scored a 1350 on her SAT in high school, and earning several scholarships in order to attend Erskine.  However, Plaintiff alleges that she was denied a positive learning environment due to the hostility she felt from the defendants.  Bowe Dep., 376.  Plaintiff felt humiliated on campus among her peers because she became known as the "rape girl" on campus.  Doe Dep., 419.  Plaintiff attempted suicide the week before her spring break in 2004.  Id., 342.  During her deposition, Plaintiff responded by saying that she wanted to die because she was tired of being scared and living her life with everything being in question.  Id.  Plaintiff went on to explain that she felt like a burden to everyone, and that a year had passed and she did not feel any better.  Id., 343.  Plaintiff woke up the next day in the hospital confronted by a person from the state mental hospital to decide whether or not she should be released or institutionalized.  Her diagnosis was post traumatic stress disorder due to rape.  Id., 347.

---

[13] Dr. John Chase served as Erskine's President for seven years beginning in 1998, but is currently on sabbatical.  Carson Dep., 5.

## OCR Complaint

On November 10, 2003, the plaintiff filed a formal complaint with the Office of Civil Rights (hereinafter "OCR). OCR is responsible for enforcing Title IX of the Education Amendment Act of 1972 (hereinafter "Title IX"), 20 U.S.C. Sections 1681, et seq. The agency formally investigated the plaintiff's complaints and found Erskine in violation of several provisions of Title IX. Erskine was found guilty of several violations, including but not limited to: (a) failure to follow its own sexual harassment policy which stated that, "confidentiality can only be respected insofar as it does not interfere with the College's legal obligation to investigate allegations of misconduct which, when brought to their attention require it to take corrective action; (b) conducting a limited investigation in January 2003 and not issuing any reports or findings until after the CDA process was completed in August 2003; (c) failure to take prompt and effective action to resolve the complaint subjecting Plaintiff to further harassment by her peers and continued contact with the male student; and (d) allowing serious charges to remain unresolved for more than 9 months. See Ex. Doe 684-685.

## Title IX

Title IX provides:

> No person . . . shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.

20 U.S.C. §1681(a)(2004)

"Sexual harassment as recognized by Title VII precedent is therefore considered a form of discrimination for Title IX purposes." Jennings v. University of North Carolina, 340 F.Supp.2d 666,

673 (M.D.N.C. 2004), *aff'd*, 444 F.3d 255 (4th Cir. 2006).[14]   Sexual harassment includes hostile

environment cases by analogy to Title VII.  See Meritor Sav. Bank v. Vinson, 477 U.S. 57 (1986), cited

with approval in Davis v. Monroe County Bd. of Education, 526 U.S. 629 (1999).  In Davis, the United

States Supreme Court held that student-on-student harassment is actionable against a federal funding

recipient when the school: (1) is deliberately indifferent to sexual harassment; (2) of which the school

has knowledge; (3) of conduct that is so severe, pervasive, and objectively offensive; (4) that it can be

said to deprive the victim of access to the educational opportunities or benefits provided by the school.

Id. at 631-50. Davis involved sexual harassment of a fifth grade school student by another student. Prior

to Davis, the Court decided Gebser v. Lago Vista Independent School District, 524 U.S. 274 (1998),

holding an implied right of action lies under Title IX for harassment of a student by a teacher where the

school district has actual notice and deliberate indifference is shown.  Davis set the legal standard for

Title IX claims involving student-on-student sexual harassment, while Gebser addresses teacher-on-

student harassment.

> School administrators will continue to enjoy the flexibility they require
> so long as funding recipients are deemed 'deliberately indifferent' to acts
> of student-on-student harassment only where the recipient's response to
> the harassment or lack thereof is clearly unreasonable in light of the
> known circumstances . . . [T]he recipient must merely respond to known
> peer harassment in a manner that is not clearly unreasonable.

Davis, 526 U.S. at 648-649.

---

[14] In Jennings, a member of the women's soccer team at the University of North Carolina brought a Title IX case against the university based upon vulgar comments and questions by the coach regarding her dating and/or sexual relationships. The Court found that there was no evidence of touching, threatening or ogling by the coach and that "no reasonable jury could find that [the coach] sexually harassed" the student.  Therefore, the Title IX claim failed to satisfy the requirement that the harassment be severe and pervasive.

"If school . . administrators were 'well aware of the [harassment], yet they deliberately ignored requests for aid from the female students wishing to use the resource . . .[then] [t]he district's knowing refusal to take any action in response to such behavior would fly in the face of Title IX's core principles, and such deliberate indifference may appropriately be subject to claims for monetary damages." Jennings, 444 F.3d at 267, *citing* Davis, 526 U.S. at 651.

A totality of the circumstances analysis is appropriate in Title IX cases in determining whether conduct is sufficiently severe or pervasive to submit a case to the jury. ". . .[S]ome behavior would be abusive in one setting, but not abusive in another setting." Jennings, 444 F.3d at 270. Relevant factors include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance . . ." Id., 444 F.3d at 269.

In Davis, the Supreme Court cited policy guidelines of the Department of Education's Office of Civil Rights regarding student-on-student harassment. See Davis, 526 U.S. at 647. The guidelines in effect when the Court decided Davis provided:

> [A school] should take immediate and appropriate steps to investigate or otherwise determine what occurred and take steps reasonably calculated to end any harassment, eliminate a hostile environment if one has been created, and prevent harassment from occurring again.

OCR, Title IX Guidelines, 62 Fed. Reg. At 12042.

### Arguments by the Defendant Regarding Title IX Claim

Erskine asserts that its response was not deliberately indifferent to the plaintiff's assault claim; that the harassment was not severe, pervasive or objectively offensive; that the harassment did not deny the plaintiff access to Erskine's educational opportunities; and that Erskine's alleged acts did not

16

proximately cause plaintiff's claimed damages.  Defendant also contends that the plaintiff's claim of direct harassment is not actionable under Title IX since the alleged acts are not "gender-oriented."

### Legal Analysis

The parties have cited this Court to no Fourth Circuit authority dealing with student-on-student sexual harassment under Title IX.  Prior to <u>Davis</u>, the Fourth Circuit decided <u>Brzonkala v. Virginia Polytechnic Institute</u>, 132 F.3d 949 (4th Cir. 1997), rehearing en banc granted, opinion vacated; 169 F.3d 820 (4th Cir. 1999), affirming dismissal of claim under Violence Against Women Act; affirming district court's finding that the claim for disparate treatment should be dismissed based on sufficiency of the evidence; and vacating the district court's dismissal of the hostile environment claim under Title IX and remanding with instructions to hold the claim in abeyance pending a decision in <u>Davis</u>.  The Supreme Court issued an opinion on appeal of the case which concerned only the Violence Against Women Act. <u>See</u> <u>United States v. Morrison</u>, 529 U.S. 598 (2000).

Although <u>Brzonkala</u> is not determinative of the analysis of this case, and its facts are certainly more egregious than the alleged facts herein, the discussion by a panel of the Fourth Circuit of the hostile environment aspect of the case is of interest by way of background as to the development of Title IX law.  <u>Brzonkala</u> involved the gang rape of a Virginia Tech student by football players who allegedly received only minor punishment from the school.  In discussing the hostile environment claim, the Court utilized Title VII principles as later approved by <u>Davis</u>.  "Under Title VII, a plaintiff cannot recover because a fellow employee sexually harassed the plaintiff, but only because an *employer* could have, but failed to, adequately remedy known harassment." <u>Brzonkala</u>, 132 F.3d at 958.  Accordingly, the Court reasoned that, "in a Title IX hostile environment action a plaintiff is not seeking to hold the school responsible for the acts of third parties (in this case, fellow students).  Rather, the plaintiff is

17

seeking to hold the school responsible for its own actions, i.e. that the school 'knew or should have known of the illegal conduct and failed to take prompt and adequate remedial action." Id. Analyzing the facts of the case, the Court stated:

> She alleges a legion of procedural irregularities in the hearing process, Virginia Tech's disregard for its own rules of finality, and its eventual decision to impose virtually no penalty for an admitted rape. These facts, if proven, would allow a jury to find that Virginia Tech's response to Brzonkala's gang rape was neither prompt nor adequate.

Id. at 961.

In Jennings, the Fourth Circuit (in a teacher-on-student case) similarly enumerated four elements to a hostile environment case under Title IX, after Davis and Gebser:

> (1) that [the student] belongs to a protected group (e.g., a student at an institution covered by Title IX); (2) that she was subjected to harassment based on her sex; (3) that the harassment was sufficiently severe or pervasive to create an abusive educational environment; and (4) a cognizable basis [exists] for imputing institutional liability under Title IX.

Jennings, 444 F.3d at 267.

Courts across the country have recently addressed issues since Davis relating to proof of Title IX claims, and the outcome is governed by the facts of the particular case. See Zamora v. North Salem Cent. School Dist., 414 F. Supp.2d 418, 425 (D.N.Y. 2006) ("While this Court acknowledges the Supreme Court's admonition in Davis that the deliberate indifference question is not a mere 'reasonableness standard' that transforms every school disciplinary decision into a jury question, in a case such as this, the issue seems best suited for a jury to consider the range of all known circumstances, from the District's apparently efficient response on February 26, 2004, to its earlier decision not to remove Gordon from the classroom or more closely monitor his interaction with students."); Williams

18

v. Board of Regents of University System of Georgia, 2006 WL 561815 (11th Cir. 2006) (University student sufficiently alleged deliberate indifference by university in Title IX claim based on student-on-student harassment where university delayed in holding hearing and failed to inform athletes about policies); Manfredi v. Mount Verson Bd. of Educ., 94 F.Supp.2d 447 (S.D.N.Y. 2000) (Title IX not violated where victim of sexual touching by another student was moved to another class as soon as school officials learned of incident); Biggs v. Board of Educ. Of Cecil County, Md., 229 F. Supp.2d 437 (D. Md. 2002) (school not liable where it took significant actions each time student complained of teasing); Wilson v. Beaumont Independent School Dist., 144 F. Supp.2d 690 (E.D. Tx. 2001) (Title IX violation not present where teacher reported incident and physically segregated the perpetrator from the rest of the class and principal transferred the alleged perpetrator to another school); Vance v. Spencer County Public School Dist., 231 F.3d 253 (6th Cir. 2000) (response to sexual harassment insufficient where the officials talked to the offenders); and Gabrielle M. v. Park Forest-Chicago Heights, 315 F.3d 817 (7th Cir. 2003) (school officials immediately placed male elementary school student on one-day suspension and had a conference with his mother after first incident and referred him to receive certain services and moved him to another class after second incident).

  In the case at bar, the plaintiff alleges that the defendants violated Title IX by (1) repeatedly telling her that they were ill-equipped to handle her sexual assault claim; (2) failing to treat her with the sensitivity and patience demanded in the handling of sexual assault cases; (3) failing to promptly and properly investigate her sexual assault complaint; (4) failing to adopt CDA procedures and/or deviating from their existing CDA procedures in her case; (5) threatening her with disciplinary action should she elect to pursue a CDA hearing and then imposing that disciplinary action without a fair and just hearing; (6) failing to properly educate and train Erskine faculty and staff in the handling of a sexual assault

claim; and (7) failing to take timely, appropriate action to attempt to prevent interaction between the two students, such as requiring the perpetrator to change dorms, working out dining schedules, and avoiding contact in classes where possible.

### Denial of Motion for Summary Judgment on Title IX Claim

The Court finds that genuine issues of material fact exist as to the plaintiff's Title IX claim. First, the plaintiff alleges that Dean Wooley claimed to have conducted his own investigation into the matter and that the male student was very bright, very intelligent, and "going places." On January 7, 2003, the plaintiff and her mother met with Wooley and Agnew regarding her fears of running into her assailant on campus. They wanted a restraining order, but Dean Wooley said that a restraining order was not necessary because he would have a "heart-to-heart" talk with the male student. Despite this promise of a "heart-to-heart talk" with the male student, Plaintiff alleges that she continued to suffer frequent encounters with the student.

Second, Chief Estep[15] received the no-contact order of the magistrate by facsimile from the plaintiff's mother after the student's arrest in April of 2003; Estep showed the facsimile to Dean Wooley. He recommended to Wooley that Erskine comply with the no-contact order by having the male student commute from off-campus. However, Dean Wooley responded that they are both students and both have a right to an education and that the male student had not been found guilty of any crime. Alternatively, Estep recommended that the male student be removed from Kennedy Dorm and relocated across campus because Kennedy Dorm was right next to the plaintiff's dorm, Bonner Dorm. This move

_____

[15] Chief Estep was not only the chief public safety officer at Erskine, but he also gave State's evidence at the preliminary hearing held in the criminal proceeding against the alleged perpetrator of the rape. (Estep depo., 20)

was not implemented until the spring of 2004, seven or eight months after the setting of the bond conditions with actual notice to Erskine.

Third, the plaintiff argues that Erskine failed to follow its normal procedures both leading up to the CDA hearing and during the hearing itself. Plaintiff contends that when she pursued CDA disciplinary action against the male student, Defendants subjected her to disciplinary action for engaging in sexual misconduct. This was so despite the fact that the only charge brought before the CDA Committee on the day of the hearing was whether or not the male student was guilty of sexual assault. Plaintiff alleges that, at the CDA hearing, Erskine substantially deviated from its normal CDA procedure: (1) Chief Estep was not allowed to testify despite the fact that it was usual practice for Estep to testify in cases involving criminal activity; (2) Plaintiff and the male student were made to appear before the CDA in the same room at the same time even though historically Erskine did not allow the accuser and the accused in the same room to promote free discussion; and (3) the CDA members and faculty never received Erskine's definition of sexual assault.

The plaintiff additionally supports her allegations regarding the alleged deviations from normal disciplinary hearing procedure through the testimony of her expert witness, Dr. John Lowery. Defendants argue that the testimony of Plaintiff's expert should not be considered as a matter of law under Rule 702 of the Federal Rules of Evidence. However, in cases where expert testimony that is not scientific in nature is proffered, the district court has broad discretion to consider whatever factors bearing on the validity of the testimony that the court finds to be useful. Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1999). Dr. Lowery earned a doctorate in Higher Education Administration and currently serves as an assistant professor of Higher Education and Student Affairs. He has co-authored numerous articles on the subject of higher education, and has served as an expert

witness in a case where a student filed a lawsuit against Ohio State University for the manner in which the school handled her sexual assault case. Rule 702 FRE allows an expert to answer hypothetical questions and offer opinions not based on first-hand knowledge because his opinions presumably "will have a reliable basis in the knowledge and experience of his discipline." Certain Underwriters at Lloyd's v. Sinkovich, 232 F.3d 200, 203 (4th Cir. 2000), citing Daubert. Defendants will be afforded the opportunity to conduct vigorous cross examination, present contrary evidence and insist on careful instruction on the burden of proof as traditional and appropriate means of attacking Plaintiff's expert testimony. Daubert, 509 U.S. at 596. The Court finds that the evidence presented by the plaintiff is sufficient even without the expert testimony of Dr. Lowery to withstand summary judgment on the Title IX claim. However, his opinions are summarized hereinbelow.

Dr. Lowery provided several examples of Erskine's mishandling of Plaintiff's complaint. (1) By threatening Plaintiff with punishment should she bring charges against the male student or proceed with a CDA hearing. Lowery Dep.,51 and 69. (2) By changing existing hearing procedures, developing new procedures for her case, and generally deviating from the provisions of the college's Student Handbook, "The Pilot." Id., 51-52. (3) By bringing in an outside individual to the hearing as the presiding officer because this had never been done before and clearly deviates from The Pilot. Id., 52. (4) By failing to take greater action at an earlier point in time, which also served to discourage Plaintiff from bringing charges. Id., 55-56. (5) By failing to provide Plaintiff with the CDA policies and procedures prior to her making the decision of whether or not to proceed with a hearing. (Making this policy available to Plaintiff would have allowed her to be prepared for what would happen if she proceeded. Id., 121-122. There does not appear to be any indication of any other opportunity for Erskine to consider pursuing disciplinary action against Plaintiff for engaging in unbecoming conduct.

Id., 62-63.) (6) By repeatedly telling the plaintiff through certain officials that Erskine was ill-equipped to handle this sort of complaint. Id., 69. (7) By being denied procedural fair play under the provisions of The Pilot, which states that procedural fair play requires that a student be informed of the nature of the charges and be given a fair opportunity to refute them.[16]

Fourth, the plaintiff alleges that she was raped and that she was referred to on campus as the "rape girl". She further alleges that, despite the condition of the bond specifying no contact, she continued to have continuous contact with the male student in the many instances described in this Order and in the record. She testified that she felt physically threatened when she was around him.

Fifth, the plaintiff took a medical leave from school during her first semester and lost scholarships due to her drop in grades. This and other evidence is sufficient to show deprivation of educational opportunities to withstand a motion for summary judgment.

Based upon the evidence presented, at this juncture, and looking at the evidence in the light most favorable to the plaintiff, the court denies the defendant's motion for summary judgment on the Title IX claim.[17] The Court must take the facts in a light most favorable to the plaintiff that a sexual assault by the male student occurred; that she feared the male student; that a judicial officer ordered the parties

---

[16] While portions of Dr. Lowery's testimony may not be admissible as impermissible legal conclusions, his testimony as to the CDA hearing process appears relevant, helpful to the jury, and admissible. The Court notes that the defendant has filed a motion in limine as to Dr. Lowery's testimony. The Court is inclined to allow the expert testimony except insofar as it may seek to state an opinion as to a legal conclusion. Opinions as to whether Erskine was "deliberately indifferent" or in violation of Title IX would be improper legal conclusions.

[17] While the record contains sufficient evidence to withstand a motion for summary judgment without considering the OCR findings, the Court also takes note of the findings by the OCR that Erskine violated Title IX. After investigation, the OCR concluded that Erskine "did not take reasonable, prompt and effective action to resolve the [sexual assault] allegation once it had knowledge of the Complainant's allegations of sexual assault as . . . required by the Title IX regulation." 34 C.F.R. Section 106.

23

to have no contact and that the school officials knew of the conditions of the bond yet deliberately chose to ignore it for a period of time; that repeated contacts occurred on campus, including assignment by the school of the perpetrator as a lab assistant to a class in which the plaintiff was enrolled.  While Erskine did take some action in response to the situation, a jury issue is created whether it was deliberately indifferent and whether it responded in a manner that was or was not clearly unreasonable in light of the circumstances of the case.

### Intentional Infliction of Emotional Distress

Defendants also move for summary judgment on the outrage claim, alleging that the plaintiff's evidence does not support such a claim as a matter of law.  A claim for intentional infliction of emotional distress requires a plaintiff to show:  (1) the defendant intentionally or recklessly inflicted severe emotional distress, or was certain or substantially certain that such distress would result from its conduct; (2) the conduct was so extreme and outrageous as to exceed all possible bounds of decency and must be regarded as atrocious and utterly intolerable in a civilized community; (3) the defendant's actions caused the plaintiff's emotional distress; and (4) the emotional distress suffered by the plaintiff was so severe that no reasonable person could be expected to endure it." Bergstrom v. Palmetto Health Alliance, 358 S.C. 388, 596 S.E.2d 42, 48 (2004).  "It is a matter for the court, not a jury, to determine in the first instance whether the conduct in question can reasonably be regarded as so extreme and outrageous as to permit recovery." Williams v. Grimes Aerospace Co., 988 F. Supp. 925, 942 (D.S.C. 1997).  Unless the defendant's alleged actions are so extreme and outrageous as to exceed all possible bounds of decency, summary judgment is appropriately entered in the defendant's favor.  See Gattison v. S.C. State College, 318 S.C. 148, 456 S.E.2d 414, 419 (Ct. App. 1995).  The judge should submit

the issue to the jury only when reasonable persons might differ on this issue. Shupe v. Settle, 315 S.C. 510, 445 S.E.2d 651, 655-56 (Ct. App. 1994).

The Court finds that the defendants' conduct in this case fails to rise to the "extreme and outrageous" level required to satisfy the second element of an outrage claim. The alleged acts of the defendants that the plaintiff claims are outrageous include the alleged failure to remove Plaintiff from on-campus encounters with the male student, the alleged failure to investigate Plaintiff's complaint in a timely manner, the refusal to allow Estep to testify at the CDA hearing, allegedly distributing Plaintiff's medical records to the CDA members without Plaintiff's consent, and Carson's allegedly defaming Plaintiff in the letter he wrote upholding the PAC's decision on Plaintiff's CDA appeal. These alleged acts were not "so extreme and outrageous as to exceed all possible bounds of decency and regarded as atrocious and utterly intolerable in a civilized community."[18]

The Court further notes that the tort of outrage was not intended to replace existing causes of action but was intended as a remedy for tortious conduct "where no remedy previously existed." F. PATRICK HUBBARD AND ROBERT L. FELIX, THE SOUTH CAROLINA LAW OF TORTS 438 (3RD ED. 2004). The tort of outrage may also be preempted by a federal statute. Id. at 441. In the instant case, the basis for most of the acts the plaintiff claims are outrageous conduct also serve as the basis for her Title IX claim which the Court is allowing her to pursue.

Therefore, the motion for summary judgment is granted as to the outrage claim.

---

[18] Even callous, offensive, or extremely insensitive behavior does not necessarily establish the tort of outrage. See Hawkins v. Greene, 311 S.C. 88, 427 S.E.2d 692, 694 (Ct. App. 1993); Shipman v. Glenn, 314 S.C. 327, 443 S.E.2d 921, 922 (Ct. App. 1994).

25

**Defamation**

Finally, the defendants contend that the court should grant summary judgment in their favor on the defamation claim. Plaintiff stipulated at the hearing that the defamation cause of action against defendant Wooley should be dismissed.

Proof of the tort of defamation requires the complaining party to show: (1) a false and defamatory statement was made; (2) the unprivileged statement was published to a third party; (3) the publisher was at fault; and (4) either the statement was actionable irrespective of harm or the publication of the statement caused special harm. Fleming v. Rose, 350 S.C. 488, 567 S.E.2d 857, 860 (2002). A statement putting into question a woman's chastity is actionable without proof of special damage. S.C. Code Ann. §15-75-10 (1976), as amended.

Plaintiff first contends that defendant Agnew published to the CDA statements regarding plaintiff having an STD (sexually transmitted disease), when she actually had a PID (pelvic inflammatory disease). The defendant contends that all statements made by Agnew and Carson were true and thus not defamatory and that any statements made in connection with or during the CDA "hearing" were protected by the doctrine of qualified privilege.

In a defamation action, the defendant may assert the affirmative defense of qualified privilege. Fulton v. Atlantic Coast Line R. Co., 220 S.C. 287, 67 S.E.2d 425, 428 (1951). "The privilege arises from the necessity of full and unrestricted communication concerning a matter in which the parties have an interest or duty, and is not restricted within any narrow limits." Conwell v. Spur Oil Co. of Western South Carolina, 240 S.C. 170, 125 S.E.2d 270, 275 (1962). Accordingly, if such privilege exists, the plaintiff may not recover without proving actual malice or that the scope of the privilege has been exceeded. Swinton Creek Nursery v. Edisto Farm Credit, ACA, 334 S.C. 469, 514 S.E.2d 126, 134

(1999).  To prove actual malice, the plaintiff must show that the defendant acted "recklessly or wantonly, or with conscious disregard of the plaintiff's rights." Cooper v. Laboratory Corp. of America Holdings, Inc., 150 F.3d 376, 381 (4th Cir. 1998), *quoting* Constant v. Spartanburg Steel Prod., Inc., 316 S.C. 86, 447 S.E.2d 194, 196 (1994).

The court must decide as a matter of law whether an occasion gives rise to a qualified or conditional privilege.  Murray v. Holnam, Inc., 344 S.C. 129, 542 S.E.2d 743, 749 (Ct. App. 2001). "A communication made in good faith on any subject matter in which the person communicating has an interest or duty is qualifiedly privileged if made to a person with a corresponding interest or duty even though it contains matter which, without this privilege, would be actionable." Id. Communications between officers and employees of a corporation are qualifiedly privileged if made in good faith and in the usual course of business.  Id.

With regard to the plaintiff's claim of defamation against Agnew, in her brief she argues first that Agnew told the CDA that the plaintiff had an STD, when the medical records mentioned a PID. She also indicates that Agnew insinuated that the plaintiff had an STD.  The defendant Agnew submitted an affidavit in support of the motion for summary judgment in which she averred that her statement to the CDA regarding the STD was simply in response to a request by the committee for a review of her conversations with the plaintiff.  According to the affidavit, Agnew simply recounted the content of those conversations.[19]

Once the moving party has brought into question whether there is a genuine issue for trial on a material element of the non-moving party's claims, the non-moving party bears the burden of coming

---

[19] Agnew's affidavit indicates that she holds a BS in health and physical education; a MED in health education; and a Doctor of Education in health education.  She has also taught courses in health education.

forward with specific facts which show a genuine issue for trial. Fed. R. Civ. P. 56(e); Matsushita Electrical Industrial Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574 (1986). The non-moving party must come forward with enough evidence, beyond a mere scintilla, upon which the fact finder could reasonably find for it. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).

In the case at bar, the plaintiff has brought forth no evidence to controvert the allegations of Agnew's affidavit as to the context of her statements to the CDA. Plaintiff has not contended by affidavit or otherwise that Agnew inaccurately or falsely recounted to the CDA the substance of her conversations with the plaintiff or offered any evidence that Agnew's actions were malicious or reckless. The Court finds that the statements by Agnew were not defamatory as a matter of law, where the plaintiff has not contested that they were made at the hearing and only in connection with recounting her conversations with the plaintiff as requested by the CDA. Moreover, the Court finds that the occasion of the CDA hearing was covered by the doctrine of qualified privilege and that no rational trier of fact could conclude, based on the evidence presented, that Agnew abused the qualified privilege or acted in bad faith. Therefore, the defamation claim is dismissed as to Agnew.

Plaintiff also alleges that Carson published a "statement that Plaintiff engaged in consensual sex with (the male student)" to professors Lowry and Wingard. The letter actually states: "I can in no way condone the sexual involvement which was consensual up to the point of debate between the two parties." (See exhibit 19 to Carson Depo.) Defendant Carson contends that his letter simply reflects what the plaintiff freely admits in this case, that she allowed the male student to remove her clothes and perform oral sex on her; the parties merely debate whether the male student raped the plaintiff.

The Court agrees with defendant Carson that the letter does not state that the plaintiff consented to sexual intercourse with the male student and finds that the letter does not contain a false statement

regarding the plaintiff, where she admits that she allowed the male student to perform oral sex on her. Moreover, the letter was published only to Lowry, a member of the CDA, and Wingard, who normally serves as chairman of the CDA but recused himself in this case since the plaintiff had already discussed her allegations with him. Therefore, the Court finds that, even if the letter contained a defamatory statement, the communication to both Lowry and Wingard was covered by qualified privilege since the letter was the President's official letter showing his concurrence with the CDA and PAC decisions and both Lowry and Wingard had official involvement in the CDA. In addition, the plaintiff admits that she discussed the alleged sexual assault with Wingard, so he was already aware of the matter. The Court finds that the statements by Carson in the letter were qualifiedly privileged and that the plaintiff has not shown that the letter was sent with malice or with reckless disregard of the plaintiff's rights or that the scope of the privilege was exceeded. The motion for summary judgment is granted as to Dr. Carson on the defamation cause of action.

Since the motion for summary judgment has been granted as to the individual defendants who allegedly defamed the plaintiff, summary judgment is also granted to defendant Erskine on this cause of action as its liability is premised upon the conduct of its agents, Agnew and Carson.

## Civil Conspiracy

The Court issued a Minute Entry on February 6, 2006 finding that the plaintiff had withdrawn the claim for civil conspiracy at the hearing held on February 3, 2006. However, the plaintiff has covered this issue in her proposed order. Therefore, although the Court believes the plaintiff conceded this claim at the hearing, in an effort to avoid any confusion on the issue the Court will consider the matter. The plaintiff contends that the defendants acted individually and in concert for the purpose of injuring the plaintiff in their actions and inactions described herein.

29

The Court finds that summary judgment should be granted to all defendants on this point. "No conspiracy can exist if the conduct challenged is a single act by a single corporation acting exclusively through its own directors, officers, and employees, each acting within the scope of his employment." McMillan v. Oconee Memorial Hospital, 367 S.C. 559, 626 S.E.2d 884 (2006). Therefore, no conspiracy could exist among Erskine and its employees, where they were clearly acting within the scope of their employment.

In addition, the plaintiff has failed to prove the required elements of civil conspiracy. "Civil conspiracy is a combination of two or more parties joined for the purpose of injuring the plaintiff thereby causing him special damage." Future Group, II v. Nationsbank, 324 S.C. 89, 478 S.E.2d 45, 50 (1996). The tort of civil conspiracy has three elements: (1) a combination of two or more persons; (2) for the purpose of injuring the plaintiff; (3) causing plaintiff special damage. Kuznik v. Bees Ferry Associates, 342 S.C. 579, 538 S.E.2d 15, 31 (2000). In order to establish a conspiracy, a plaintiff must produce either direct or circumstantial evidence from which a party may reasonably infer the joint assent of the minds of two or more parties to the prosecution of the unlawful enterprise. First Union Nat. Bank of South Carolina v. Soden, 333 S.C. 554, 511 S.E.2d 372, 383 (Ct. App. 1998). "A conspiracy is actionable only if overt acts pursuant to the common design proximately cause damage to the party bringing the action." Id.

In the case at bar, the Complaint does not plead specific facts in furtherance of the conspiracy; instead, the Complaint simply restates alleged wrongful acts pled in relation to the plaintiff's other claims for damages. See Todd v. S.C. Farm Bureau Mutual Ins. Co., 276 S.C. 284, 278 S.E.2d 607 (1981), rev'd on other grounds, 283 S.C. 155, 321 S.E.2d 602 (1984), quashed in part on other grounds, 287 S.C. 190, 336 S.E.2d 472 (1985). Because Plaintiff has not asserted any additional acts

in furtherance of the alleged conspiracy, the claim for civil conspiracy is dismissed. See Todd, 278 S.E.2d at 611.

Plaintiff's conspiracy claim also fails as a matter of law because Plaintiff has failed to plead or prove special damages. See Vaught v. Waites, 300 S.C. 201, 387 S.E.2d 91, 95 (Ct. App. 1989); Robinson v. Metts, 86 F.Supp.2d 557, 563 (D.S.C. 1997). In order to satisfy the third element of a civil conspiracy claim, a plaintiff must allege and prove damages that occurred because of the conspiracy itself, in addition to any damages alleged because of any other claims. See Metts, 86 F.Supp. at 563. Plaintiff has not alleged and cannot prove any special damages in relation to her civil conspiracy claim as required under South Carolina law. Instead, Plaintiff's civil conspiracy count merely realleges the same damages Plaintiff claims to have suffered in relation to her other claims. See Complaint.

Finally, Plaintiff has produced no evidence that reasonably leads to the inference that Defendants positively or tacitly came to a mutual understanding to seek to accomplish a common and unlawful plan to injure her. Mere speculation about a party's motives with respect to certain conduct does not constitute proof of a conspiracy. See First Union Nat.Bank of South Carolina v. Soden, 333 S.C. 554, 511 S.E.2d 372, 383 (Ct. App. 1998). Because the record is devoid of any evidence suggesting or proving that any of the Defendants undertook any enterprise for the purpose of injuring Plaintiff, she cannot establish the second element of civil conspiracy.

31

### Conclusion

The defendant's motion for summary judgment is **DENIED** as to the plaintiff's Eighth Cause of Action brought pursuant to Title IX. The motion for summary judgment is **GRANTED** as to the plaintiff's FIFTH cause of action for intentional infliction of emotional distress. The motion for summary judgment is **GRANTED** as to the Seventh Cause of Action for defamation. The motion for summary judgment is **GRANTED** as to the Tenth Cause of Action for civil conspiracy.

**AND IT IS SO ORDERED.**

s/ R. Bryan Harwell
R. Bryan Harwell
United States District Court Judge

May 25, 2006
Florence, South Carolina